Case No. 14-1253FL, Osburn-Hessey Logistics, LLC Petitioner v. National Labor Relations Board Mr. Bozzi for the petitioner, Mr. Seid for the respondent, and Ms. Shaw for the intervener Good morning, your honors. May it please the court, I'm Ben Bozzi, here on behalf of the petitioner, Osburn-Hessey Logistics, commonly referred to as OHL. There are a number of distinct issues in this appeal, and I'm going to focus on the ones that relate to this one. Could you bring the mic up a little bit? If you want to raise the podium, you can do that. There's a button down on your right if that's more comfortable. I'm going to focus on the issues that relate to the certification, because that's the most significant aspect of this appeal. Your honors, as it currently stands, the USW won a union election by a vote of 169-166, and there are still three ballots that are disputed in that issue here in this proceeding today that we'd like to address. And I'll start by explaining the significance of those three ballots. In board elections, a tie goes to the employer. So if OHL succeeds on the three ballots that are at issue here today, then it would be a 168-168 vote, potentially, which could change the outcome of the election. It's outcome determinative. That's why it's significant. It's important to note that all three of these ballots were ballots that were at issue before the election ever took place. So Carolyn because she had filed an unfair labor practice charge relating to her discharge. So special arrangements were made for her to come and vote, subject to challenge. The administrative assistants, the two administrative assistants, were, there was an express agreement between the company and the union that recognized that there could be a dispute about whether to include the administrative assistants, and it reserved the issue until after the election if it turned out to be outcome determinative. We submit that it is. So these are all ballots that were in dispute before the election ever took place. If you lose on Jones, you lose, right? Yes, Your Honor. Okay. And likewise on the administrative assistants. Yeah, I understand. Yeah. Clearly we have to win all three votes. Carolyn Jones, I want to start by talking about Carolyn Jones. Carolyn Jones, she was a strong union supporter. OHL knew she was a strong union supporter. That part's not in dispute. The question here is whether or not her conduct justified her termination, regardless of her union support. No, the question is whether the ALJ and thus the board's determination that the particular discipline given was pretextual, whether or not there's substantial evidence supporting that. Whether there's substantial evidence supporting it and whether it's a departure from existing board law, that's correct, Judge Edwards. The, let me start with what I think is a legal issue, that the route trucking case. The board relied on one of its cases called route trucking, which said that if the board establishes pretext, the board never shifts on your right line to the employer to present its defense. Route trucking is a case that has never been, the problem with route trucking is that it changes the fundamental right line analysis. So under right line, there's a prima facie case that the general counsel presents. And part of that prima facie case is not that the employer's profit reason is pretext. But what the board does is they say, well, if the general counsel proves pretext, we don't even examine whether the employer's profit reason would have led to the disciplinary action. And part of the problem here is that in Sutter versus East Bay, Sutter East Bay Hospital versus NLRB, this court specifically said that it's the employer's honest belief that the employee When you skip straight to pretext, you're skipping over the honest belief analysis, which is a problem from our perspective. And it departs from right line, because the analytical framework of right line is that the employer presents its evidence after the general counsel proves a prima facie case. So Mr. Bonzi, are you asking us to repudiate route trucking? Yes, Your Honor. I think it departs from existing board law in that it changes the right line framework that this court has recognized and applied repeatedly. Why is it not just an application of right line in a case in which there is not a separate legitimate and non-infringing reason? I mean, the inquiry in the typical Mount Healthy right line case is whether there is either one reason, the genuineness and legality of which is in dispute, in which case, once it's shown that the profit reason is pretextual, then you're asking, why is it a case where there are two separate reasons? And the question is, would the employer have made the same decision based on the legitimate reason? And I take this to be in the former category of cases, so I'm just not sure why you see route as in tension with right line. I'm not sure I see that tension. If you could spell it out more. Sure. So, under the right line framework, the employer's burden doesn't kick in until the general counsel approves their prima facie case. Analytically, you don't reach the employer's legitimate non-retaliatory justification until the general counsel approves its case, its essentially what route does is it adds a fifth element to the prima facie case, pretext, where if the general counsel approves pretext, you then never shift the burden to the employer. There's no place in that analytical framework for the board to consider the employer's legitimate non-retaliatory. In this case, I mean, I think I understand what you're saying, but in reality, all of that's being considered here. You obviously, the employer obviously had an opportunity to present its defense, and in the end, the board said, we hear you, it's pretextual. The board didn't say you're foreclosed from presenting what you feel is a legitimate reason for discharge. They said, we hear you, and you know what? You're treating her differently than you have treated people in the past, and therefore, your argument goes nowhere. She was a strong union adherent, and our determination is when we look at what you've done in the past as compared to her, it's not the same, and so we're concluding it's pretextual. Okay. Your Honors, I understand your question, and let me address the question of whether it was pretextual, and get away from the retargeting argument. Let me just, before you get away, I do want you, I don't want to interrupt and prevent you from answering that, but just to clarify, was there a burden that you thought the general counsel should have borne that the general counsel didn't bear, and or was your client deprived of any opportunity to put something forward that it would have put forward? That would help me understand where you think the error, if any, is in the burden-shifting analysis. Right, and the answer to that question is because the board went straight to the pretext analysis, it's not clear whether the board was just listening to the arguments of general counsel, because the burden had never shifted to OHL, or whether the board was taking into account the arguments that OHL was putting forward as well. So you're not contending that there were arguments and proof that Osborne-Hesse had that it was not given an opportunity to put forward. It's more about the conceptual framework that you're inferring the ALJ was applying. That's right. Okay, so proceed now and talk about, you were going on to talk about the evidence. I was going to talk about the pretext evidence, and recall here the allegation is that Mr. Jones called Lee Smith a UT repeatedly, and then she explained that that meant Uncle Tom. And this court has recognized that Uncle Tom is a phrase that is racially charged, I believe, was the language. Well, that isn't the point. I mean, that's all correct. But I've heard the record say ten times or something like that over a period of time. And was she ever disciplined or warned for any of that until the last time? She was disciplined when it came to OHL's attention. I mean, when it was brought to management's  No one until that last moment had said, you're skating on thin ice, or you're doing something wrong, or we're going to take initial action against you. Nothing. Well, there's no evidence in the record that OHL had knowledge of the UT comments prior to the investigation that led to her termination. Well, then how can you count the ten times as ten times, as opposed to the first time the company found out about it? The first time the company finds out about these things, they don't discharge people. That's the whole point. Well, actually It's not like she killed someone and it was a long delay before the company found out. She'd used racial epithets. Nothing was done. It was in a company setting. It's hard to think that no supervisor or anyone else would know anything. But in any event, nothing happened, and then the company axed the 11th time or the 10th time. And in all the cases, all the comparables, on the first incident in which the company axed, they don't discharge people. A couple of things, Your Honor. OHL acted on the very first time that it was brought to OHL's attention, and there's no evidence in the record that OHL had knowledge of the UT comments prior to the investigation that led to her discharge. But there is evidence that the company used progressive discipline routinely, right? There is evidence that the company used progressive discipline in other contexts, and that's part of the issue that we've raised here, Your Honors, whether the comparators are actually similarly situated or not. There was not an analysis done by the board of whether the comparators were similarly situated or not. And it's our position Well, I mean, let me just tell you, as a reader looking at it, it leaps out. It's the first incident. Things go on and the company doesn't deal with it, and then the first time they deal with it, there are comparators for that. I think that's what the board was saying. This isn't the way you typically handle this. Your Honor, the only other employee that repeatedly used racial epithets, Ashley Burgess, was terminated. And the other comparators used grossly inappropriate. Was Burgess, is that who you just said? Yes, Your Honor. Were there some prior warnings? I don't believe so, but I don't recall exactly right now. All of the other comparators or alleged comparators were disciplined for grossly inappropriate conduct. Here, there's a violation of the anti-harassment policy, and for obvious reasons, OHL has to take prompt remedial action when this is brought to its attention to avoid liability. So there's a distinction between grossly inappropriate conduct and racially charged conduct. And that's why we submit that the comparators are not similarly situated. There was no discussion of that at the board level. I believe I'm into my rebuttal time at this point. Why don't you finish the point you're making, and we'll give you some rebuttal time. Okay. The other point, Your Honor, is the issue with the independent reason for her termination. Another independent reason for her termination was that she fabricated a witness statement. And when I say fabricated a witness statement, she had witnesses sign the statement before she actually wrote the content of the statement. Now, the board said, well, OHL later forced witnesses to sign statements that said that there was a blank, that the statement was blank above the names. We submit and we explain in our brief why the evidence just did not support that at all. There was only one witness who testified about anything that remotely comes close to coercion by OHL. And all his testimony was was I signed it because I was stressed. He didn't say because OHL stressed me out. He didn't say why he was stressed. The word he used was I signed it because I was stressed. So we don't think there's any record evidence to support that. But regardless, whether or not OHL coerced statements from witnesses later doesn't change the fact that all of the witnesses testified that they never saw Carolyn Jones' statement before they signed it. And she presented it to OHL as a completed witness statement. So the board got off on a tangent on whether or not OHL subsequently coerced statements. But that doesn't change the fact of what Carolyn Jones did based on the undisputed testimony of the general counsel's witnesses in this case. And I see that I'm out of time. So if the court doesn't have any other questions, I'll reserve the rest for her. Thank you. Thank you. Good morning, Your Honor. David Sides for the Labor Board. I would like to begin by drawing attention to the court regarding the three new and shifting arguments the company made in its reply brief regarding the discharge of Carolyn Jones. First, in the reply brief, the company asserts that the only comparable employees could be the two employees specifically disciplined under its anti-harassment policy. That's in direct contradiction with the argument made before the board and in its opening brief that the only comparable employee would be employee Burgess. And as I would note, in response to Judge Edwards' question, the board distinguished employee Burgess on a number of grounds, including that she had been previously warned for various counts. There was a prior warning and three-day suspension. That's correct, Your Honor. The second new argument the company raises for the first time is the reliance that it was concerned over permitting a hostile work environment, that there was simply no evidence that it relied on that factor at the time of the discharge, nor was it raised in the opening brief. And the third new argument it raises in the reply brief is with respect to the alleged fabrication of evidence over the statement that it was prepared by Ms. Jones over the threat to watch her back. The company asserts in the reply brief that there's no evidence that the employees who signed saw or fully read her statement. That's a very different argument than claiming as it had earlier before the board and in its opening brief that there simply was no statement for those employees to even sit, that she had completely fabricated it after the fact. Now, these new arguments, of course, were not properly before the court, but the fact that at this late date the company is still adding and changing its arguments as to why it lawfully discharged Carolyn Jones does add further support for the board's finding that the discharge was unlawful. And if I could just touch on one other point with respect to the right line analysis. Very simply, the company hasn't asserted how the board erred here in the application, putting aside that what the board did in the rear trucking case is no different than what it's been doing for the last 30 years. But very simply, in this case, the board first addressed an affirmative case to find out, to make the finding, that the discharge was unlawfully motivated. And then very specifically, at pages 746 and 747 of the appendix, went through a nearly two-page discussion of the reasons that were asserted by the company and why it found a merit to them and ultimately found that they were pretextual reasons. With respect to the other findings made by the board in both the unparalleled practices, as well as with respect to whether it made the proper unit determination as far as excluding the two employees from the unit, those are simply evidentiary findings, credibility findings, and are amply supported by the record. And unless this court has any specific questions, the board would simply ask that it enforce the unparalleled labor practice findings and the finding that the company had an obligation to argue with the union. That's good. Go ahead. There was one other employee. I just want to make sure I have the record right. Employee Jay Smith, also a similar offense, was not initially fired, right? That's correct, Your Honor. All right. So the comps are Burgess and Smith, and they were not initially fired. That's correct, Your Honor. Thank you. Thank you. Good morning, Your Honors. I'm Catherine Shaw on behalf of the intervener, United Steelworkers. I wanted to add that the company is also asking this court to hold that an employer cannot be found to have engaged in disparate discipline unless there's an identical comparator. The board's decision shows that the only person who was discharged for inappropriate language was Ashley Burgess. In that case, there was a prior warning, and there was also a connected assault. In this case, the company has also not demonstrated that it had a good-faith belief that Jones had fabricated a witness statement. Given that its purported good-faith belief was based on the self-serving statement that it coerced employees into signing. In addition to saying that one of the witnesses was stressed about being asked to sign the statement, he said that he only signed it because he wanted this meeting with management to end. If there are no questions that are... There's no testimony that the statements, as they ultimately came out, did not represent the views of the individuals. It was a question of when they were filled in, but is there any allegation that they actually misrepresented the substantive views of the individuals? No. The credited witness testimony was that the Carolyn Jones witness statement that she asked employees to sign was a substantially accurate description of what had happened. All of the witnesses who signed that statement said that it reflected what they had witnessed. By contrast, the statement that they were asked to sign by the company was inaccurate. On that basis, I do not believe that the company has demonstrated that they had a good-faith belief that she had submitted a false witness statement. Additionally, the company took no steps to discipline Phil Smith, who actually did provide a false statement regarding the incident. This is the supervisor who threatened Carolyn Jones. It seems everybody in this case is named Smith. I think there are six Smiths. I wonder if you could address just briefly the surveillance and impression of surveillance claims. The company argues that they are allowed to observe in the course of interactions with employees, and the ALJ found that this was something more. How do you defend that on this record? As to the surveillance, the allegation regarding observation of union hand-billers in the company parking lot, although an employer may lawfully observe employee activities on company premises, it engaged in unlawful surveillance in this situation because it engaged in out-of-the-ordinary surveillance of the union hand-billers. There are two individuals, John McNamee, who is the director of risk management, and Randall Coleman, the senior vice president, who both engaged in highly out-of-the-ordinary activity, walking out to their cars, walking around, looking alternately at the ground and at their cell phones for five to ten minutes, looking at the hand-billers. They gave very inconsistent testimony about what the purpose of their presence in the parking lot was. Initially, the director of risk management, John McNamee, stated that he had not observed the hand-billers. As his testimony proceeded, he admitted that, well, yes, he had observed them, and although he initially stated that he did not know whether or not they were union supporters, he eventually admitted that he presumed that they were union supporters engaging in hand-billing. So this type of surveillance is coercive because it is out-of-the-ordinary, and it leads employees to believe that their union activities are being observed and that they may face retaliation from the company because of their support for the union. And is that the only guidance, legal guidance for the ALJ, is whether it's out-of-the-ordinary? And just looking at the circumstances as a whole, there's not any more, I mean, there's not anything more specific for the company where they're, you know, presumably they're allowed to go look at something that is itself out-of-the-ordinary when the employees congregate together, but they have to be cognizant of some limit. And I'm just trying to think from the employer's perspective, how do they know when they're getting close to that line? Well, I think it is a line that the board has to draw and that, for example, in Aladdin Gaming, which was cited by the company, there was no surveillance violation because the supervisors, although they observed union activity in the employee or the company dining room, that their presence there was not so suspicious that it would cause employees to be aware that they were being surveilled and fearful about retaliation. In this case, the surveillance was so strange and out-of-the-ordinary that it was unreasonable to believe that that activity by those two supervisors would have occurred if they were not specifically seeking to surveil those union supporters. Thank you, Michele. Thank you. Thank you. Mr. Bozzi, if I can keep you to two minutes for rebuttal time. Sure. A couple of points. Judge Edwards, you mentioned J. Smith, Jennifer Smith. And actually, Jennifer Smith is part of these proceedings. The discipline that was issued to Jennifer Smith is actually before the court today. I understood that when I looked. I'm trying to get all these names straight. Right, and there are a lot of Smiths in this case. And I'm not going to use the actual language, but Jennifer Smith used a racial epithet towards a coworker. But she's claiming that she was also an open and obvious union supporter, and she's claiming that she was disciplined because of her union support. So I don't think it serves as a comparator to Carolyn Jones because they were both union supporters. So there's no argument that OHL treated Carolyn Jones more harshly on the basis of her union support when Jennifer Smith was also a union supporter. So I just wanted to address that. In terms of the good faith belief or the honest belief. Was Jennifer Smith fired initially? She was not, Your Honor. She was given a written warning. That's the point. Okay. Well, the distinction that was drawn, and it's drawn in our briefs, is that she had a heated verbal exchange with another employee where that comment was made. Right. As opposed to targeting an employee and going to them over a different. Yeah, I hear you. We differ about, one, the input. I hear you. Okay. In terms of the good faith belief. Actually, let me skip to the statement's accuracy. Judge Plater, you asked the question about whether it mattered or whether there was any contention that the statement that was ultimately written above the signatures was true or not. And, Your Honor, I'd submit the issue is not whether or not it was true or accurate. It's whether she wrote it in after collecting signatures of the witnesses. It goes to the integrity of the investigation. That's the issue, not whether the statement was true or not. In terms of the discussion of surveillance and it being out of the ordinary, out of the ordinary is the legal standard. And it's important to remember that Mr. Coleman worked in the building that he was standing outside of. And Mr. McNamee was in town to see Mr. Coleman. So the fact that they were standing outside of a building in a parking lot is not out of the ordinary. Thank you. Thank you. Case is submitted.
judges: Pillard, Wilkins, Edwards